## Hall et al. v. Fordson Coal Co.

Dec. 17, 1943.

228

Jesse Morgan and S. E. Duff for appellants.

M. C. Begley for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Affirming.

In original and amended petitions filed in 1936 appellee, plaintiff below, alleged ownership of a described boundary of land in Leslie County. Some ten persons were made defendants, and it was charged that they, without legal right, had entered and removed valuable timber. Grounds were laid for injunctive relief, damages and for a declaration of ownership in plaintiff. Those of defendants who appear as appellants are J. S. Hall, John Hall, Elizabeth Muncy, children, and two Hoskins, grandchildren of William Hall, deceased.

Appellee alleged that within its boundary it had a building, two or more fenced fields and gardens, and that defendants had moved Onzie Hoskins (grandson) onto one of these boundaries and were thereby attempting to take possession of the entire boundary. J. S.

Hall filed separate answer in which he denied and then plead that defendants own and are in legal possession of a tract of land on Bull Hollow of Upper Bad Creek of the Middle Fork of the Kentucky River; that the timber alleged to have been cut was in fact cut and removed from their boundary. There was no boundary described. It was said that defendants' boundary conflicts with and laps upon the boundary claimed by appellee.

Later defendants answered that they had been unable to procure a surveyor, but were the owners and in actual adverse possession of a boundary of land which is described, not by courses and distances, without showing derivation of title. Appellee then plead that it owned the land by virtue of a conveyance from the Stearns Land and Lumber Company; that defendants (Hall heirs) claimed the land through conveyance from, or as heirs-at-law of William Hall, and that the tract described in its petition embraced the boundary described in answer. This pleading projected the issue of bar and estoppel based on grounds hereinafter noted.

Appellee's reply brought a second amended answer which raised the real issue. Appellants first denied and then set up a description of the tract claimed by them by virtue of inheritance from their father. A second paragraph is made a counterclaim. They say this boundary is well marked and defined, and that they have been in actual adverse possession for more than fifteen years before the institution of suit. No source is given, but after search we find that the boundary is identical with that described in the grant to William Hall issued in 1887. In a third paragraph they plead that at the time Asher obtained deed from the Steele heirs, March 26, 1917, and appellee took deed from Asher in July, 1926, appellants were in actual adverse possession, hence the deeds mentioned were champertous. A later amended petition raised an issue as to additional tracts. Testimony was taken and upon submission the chancellor adjudged appellee the owner of all the land described in its original and amended petitions, which included as the first tract described in judgment the boundary in the original petition.

The chancellor dismissed appellants' answer and counterclaim, converted the temporary restraining order into perpetual injunction and directed writ of posses-

sion. During the trial it was stipulated that appellee "has a connected chain of title to the above mentioned De Groot grants, numbered 44027 to 44039, inclusive." Two of these patents, 44030 and 44032, are included in the boundary set out in appellee's petition, which includes in part the Preston Hall and William Hall grants which are junior to the De Groot grants. Appellee relies upon its record title, and the claim that by reason of the Federal Court judgment, as well as the judgment in the Hall estate settlement case, appellants are barred and estopped in their claims of adverse possession and champerty, and on the failure of defendants to establish actual adverse possession within the legal meaning of the term. We shall take up the proof of defendants by which they sought to fix their title.

While it has been difficult to ascertain from the proof and pleading just what land is claimed by appellants by virtue of adverse possession, it is certain that they claim the alleged William Hall patent (unnumbered) of 1887, and a part of the Preston Hall patent, No. 53560 of October 1877. One of these tracts, it is claimed by appellee, is embraced in two of the De Groot senior patents. These boundaries were involved in the suit in Federal Court, wherein judgment was rendered in 1902 against William and Preston Hall and thirty or more other defendants, perpetually enjoining them from encroachment, and clearing the title of the Stearns Lumber Company. Writ of assistance was awarded, but the record manifests no issuance.

The other judgment involved the Preston Hall patent. Hall was a son of John Hall, a brother of William. There is no showing of how claimed title passed from Preston. However, prior to 1897 William Hall, as administrator of John Hall's estate, instituted suit for settlement. There was not sufficient personal property to satisfy creditors, and he asked for sale of certain parcels of real estate; among these was the Preston Hall grant (included in petitioner's boundary). Preston was made defendant on the ground that he was claiming an interest; in judgment he and all others claiming under him were forever barred from setting up claim of title to any part of the land sold. The report of the commissioner was confirmed and G. H. Steele became the purchaser. He died before deed was made, and deed to the Preston Hall tract was made to the heirs

of G. H. Steele and they were given writ of possession; they conveyed to J. H. Asher in March 1917, and Asher's heirs to Fordson in 1926, all free from claim by defendants. Appellants in their counterclaim assert only that the latter deed was champertous, because at time of execution defendants were in possession of the boundary.

The effect of the judgments upon the claim of defendants will be discussed only to the extent necessary in the determination of the sole question presented. Dates are of significance. As indicated the company filed its suit October 12, 1936. Appellants claim that William Hall, in person or by tenants, entered upon the premises some time in 1903, and their adverse occupancy continued up to the filing of the suit, a period of thirty-three years. It is somewhat significant that there was no claim of possession until the year following the judgment in the Stearns' case. It is also difficult to understand why in the several pleadings appellants described different tracts of land, and in proof gave a still different boundary. John Hall, son of William, testified that appellants' boundary was well defined. He said that in March 1903 William Hall had his son-in-law Arthur Muncy moved onto the place. There was a building on it; Arthur and wife stayed there until some time in 1906. Doc Napier afterwards went in as a tenant and lived there for three years. While Napier was on the place William Hall moved in and remained on the boundary until he died in July 1916. He had taken to the home a woman housekeeper, and by her raised another family. Following his death, how long is not shown, Muncy and his wife moved in bringing with them William Hall's widow, who died in March 1919. Muncy remained on the premises until 1921. The Muncys then turned the place over to Jim Fee, a son-in-law of Mrs. Muncy, with the consent of "we children." He lived there until the winter of 1923. In 1923 or 1924 the building was torn down. No one was in the place at the time, but Mrs. Muncy had left some household goods in the building. There was no written lease to any of the heirs, but witness thought there was one to Napier, which was involved in the Federal Court suit.

On cross-examination he said his father claimed both by possession and under a patent in his own name, and that the Preston Hall 200 acres "lies over a part of the land" set up in amended answer. He said he also

knew that Taylor Sizemore was cultivating fields on the boundary during several years as a tenant of John Asher. He also said, apparently to weaken the claimed tenancy of Sizemore, that as far as he knew nobody lived on the place from 1924 to 1928. He recalled the Stearns' suit which "affected this land," and knew of the judgment in the John Hall settlement suit.

Elizabeth Muncy testified as to the occupancy, as had John Hall. She said that when she and Arthur moved out, either in 1921 or 1922, she gave authority to Jim Fee, her son by former husband, to move in. When she moved she left some household goods there for Fee to use. She knew that her husband took a lease from "the company" but she thought it was a "lease to look over other land," for which he was to receive $10 per month, but that she knew nothing of the written leases, later referred to. After Fee moved away "they tore the house down and I never moved back; Taylor Sizemore used the logs to build a crib."

Arthur Muncy testified to about the same state of facts as to occupancy. He was confronted with two leases for a boundary of land described, and said to include the boundary involved. He said he could read and write, but had not read the leases. He thought representative of the company wanted him to look after certain De Groot blocks in the Polly Asher suit, for which he was to be paid, and received $10 per month. He admitted signing the first lease, but did not recall signing the second. A comparison of writing makes it clear that he signed both. Witness says he told his wife about it "when I went back home after signing the lease." Stella Calwell was formerly the wife of Jim Fee; she and Fee moved onto the boundary in April 1923, and remained until January 1924, when they moved they left "some things" and locked the door, and never turned the key over to any one. Onzie Hoskins moved in, as he thought, in December 1926, because "my grandfather lived there and I thought I owned part of the land." Under pressure he said, in reference to the children of William Hall, "some of them told me I ought to move over there." During his stay there, and he was there when suit was instituted, he lived in the corn crib which Taylor Sizemore had built.

On February 17, 1917, Stearns Company leased to Muncy for three years, a tract of land embracing parts

of named De Groot patents, and covering the boundary in question. The consideration was that lessee was to have the use of the land for farming purposes; to use certain timber for fuel and household purposes, etc., and he was to look after and care for the property, the right being reserved to lessor to enter for timber cutting, mining and incidental purposes.

The second lease was by the Peabody Syndicate (whose right to lease is not questioned) on February 17, 1920, of the same boundary for a like period on practically the same terms. On November 11, 1922, Muncy wrote to the manager at Pineville informing him that he did not wish to lease the property again, but "I know a man who I can recommend to you that will be glad to lease the place; that is, James Fee of Warbranch, Kentucky. He is the only one I know of that would be o. k. Write him." There is no correspondence further in the record to Fee, but on January 1, 1923, Peabody, trustee, leased the same boundary to Fee for a period of one year on similar terms. On April 4, 1923, Fee sent a letter to the Peabody manager by James Hall, directing attention to the fact that some fences had burned down. He said that he was then working at Lynch, and he had locked the door and "Polly Asher put her lock on too." He said he would sign the lease, but could not afford to build the fence unless he got money to pay for labor. No further correspondence or proof as to outcome appears in the record. Fee did not testify. His former wife says they moved out in January 1924.

Taylor Sizemore said he moved in the neighborhood of the boundary in 1922; at that time James Fee lived in the old house. After he moved out Sizemore tore the house down at the request of the Asher heirs who through him took possession in 1923, and held same from then till 1936. He was a tenant of the Asher heirs from 1923 to 1928, and after that holding under leases from Fordson to 1936. He tore the house down and used the timber to build a corn crib. Mrs. Muncy had a broken-down bedstead, a book case and one chair. He "pitched" out the chair and bed, but at Mrs. Muncy's request took the bookcase home and later turned it over to her. He says that neither Mrs. Muncy nor any one of the heirs made objection to his tearing down of the house.

All argument in respect of the application of the Federal Court judgment and its effect is, of course, directed to land embraced in the Federal Court judgment, which may or may not have included all the Preston Hall tract. That judgment was rendered November 25, 1902. It seems to be admitted that plaintiffs had up until the latter date the right to a writ of assistance. Whatever the theory or argument with respect to the effect of the judgment, it is the law in this jurisdiction that where a party to a suit in ejectment remains in possession following an adverse judgment determining title, the time between the rendition of the judgment and expiration by limitation cannot be counted in determining adverse possession for the statutory period. Angel v. Le Moyne, 237 Ky. 366, 35 S. W. (2d) 540.

The theory upon which the ruling is based is evidenced in Sears v. Collie, 148 Ky. 444, 146 S. W. 1117, 1121, where we said that ''even if it be true that appellant still had possession of the land in controversy, they had, by a court of competent jurisdiction, been divested of all title. From that time on their holding was amicable and not adverse. They were there by the sufferance of the purchaser, who could have removed them at any time.''

This case answers appellants plea of champerty, if indeed the plea in any sense applies to other than to part of the Preston Hall 200 acre grant. The Le Moyne case, along with others of like import, is cited, insofar as principle is concerned, in the recent case of Creech v. Jenkins, 276 Ky. 163, 123 S. W. (2d) 267. It follows that in order to show title by adverse possession defendants must show conclusively an adverse holding contemporaneously for the statutory period. Stephenson Lumber Co. v. Hurst, 259 Ky. 747, 83 S. W. (2d) 48; Cassada v. Vanhook, 282 Ky. 383, 138 S. W. (2d) 1003; Creech v. Jenkins, 276 Ky. 163, 123 S. W. (2d) 267. Such possession need not be always in the same person, but may be by those in privity. Gray v. Wells, 239 Ky. 432, 39 S. W. (2d) 651.

Applying the rule referred to above, it is obvious that for fifteen years prior to the filing of the suit there was not such actual adverse possession on the part of those claiming title by adverse possession, as would ripen into good title. We need not recapitulate, except to say that for at least seven years of the period the

land was occupied under lease to Muncy and Fee, and it is not difficult to conclude that defendants were aware of this leasehold, and to some extent fully recognized it. The same is true as to the leasehold of Sizemore. The fact that Mrs. Muncy occupied the land during the leasehold of her husband did not aid in building up the adverse possession. A wife occupying land with her husband, a tenant of the owner, cannot maintain a claim of adverse possession without showing positive actual notice to the owner that her claim was in opposition to that of her husband and the owner. Sizemore v. Trimble, 80 S. W. 477, 26 Ky. Law Rep. 8. The fact that the mother, the widow of William Hall, lived on the place with Muncy for two and a half or three years adds little to the claim; not enough to bring the adverse possession within the statutory period.

The claim of champerty has been mentioned above. Appellants' charge related solely to the "conveyance made on said ———— day from Stearns Land and Lumber Company." This pleading does not identify any deed, but in brief it is insisted that deeds from Stearns Company in 1918 to Peabody; from it to Fordson in 1923, and from Peabody Trustee in 1923, are likewise champertous. These deeds are not in the record, though they are referred to in the stipulation admitting appellee's complete claim of record title.

It is impossible for us to tell just what boundary or boundaries are involved in these various conveyances, but be that as it may, if the claim of champertous deeds related to other than part of the Preston Hall grant, we have clearly answered the objection above by reference to the Le Moyne and Sears-Collie cases, supra. The same rule would also apply to such claim if relative to the Preston Hall patent. This land was sold under a judgment where the court had jurisdiction of the parties and the subject matter, and in which William and Preston Hall were parties, and conveyed to Steele heirs in 1889; by them to Asher in 1917; and by Asher heirs to Fordson in 1926. There was no claim or showing of adverse possession prior to 1903 and so the claim of champerty stands on the same basis as applied to any other boundary or part of boundary. Aside from this we have indicated above our conclusions in respect of the claim of actual adverse possession, showing the claim to be without legal foundation as to the fifteen years prior to 1936. This determination is sufficient

to meet the charge of champerty, not only as to the deed set up in pleading but as to all mentioned in appellants' brief. The rule is that facts essential to a plea of champerty must be clearly and strictly proven, Fordson Coal Co. v. Mills, 234 Ky. 64, 27 S. W. (2d) 382, and the proof at least as strong as that which under the limitation statute will ripen into title. See, also, Fordson Coal Co. v. Collins, 268 Ky. 331, 104 S. W. (2d) 985; Gasho v. Lowe, 282 Ky. 518, 139 S. W. (2d) 437. If there be shown no adverse possession at the time of execution of the deed, the charge of champerty fails, as it did here, so we are compelled to hold that appellants failed to maintain either the claim of champerty, or actual adverse possession for the statutory period, hence the judgment is affirmed.